# PRICE *v.* STATE.*

(In Banc. Feb. 25, 1929. Suggestion of Error Overruled March 11, 1929.)

[120 So. 751. No. 27434.]

626

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, section 9, p. 58, n. 87; Homicide, 30CJ, section 364, p. 151, n. 33; Indictments and Informations, 31CJ, section 47, p. 585, n. 47; section 384, p. 807, n. 81; section 385, p. 808, n. 93; section 392, p. 813, n. 3; p. 814, n. 5; As to effect of presence of unauthorized person in grand jury room as affecting indictment, see annotation in L. R. A. 1916D, 1123; 12 R. C. L. 1040; 2 R. C. L. Supp. 1534; 5 R. C. L. Supp. 672.

*Smith & Smith,* for appellant.

*J. A. Lauderdale,* Assistant Attorney-General, for the state.

632

Argued orally by *L. A. Smith, Sr.,* for appellant, and *J. A. Lauderdale,* for the state.

ETHRIDGE, J. The appellant, Owen Price, was indicted by the grand jury of Marshall county on a charge of manslaughter, and was tried and convicted of that offense, and from such conviction prosecutes this appeal.

The principal assignment of error is that the court erred in overruling the motion to quash the indictment

because a petition was presented to the grand jury, or was circulated and signed by several persons and reached the grand jury room, and was in the grand jury room during some part of the session of the grand jury. It was alleged in the motion to quash the indictment that the first grand jury of said county, which convened after the homicide, and after the defendant was bound over to wait the action of the grand jury, failed and refused to indict the defendant; and that, after the first grand jury convened, and subsequent to the date of its adjournment, the friends and relatives of the deceased procured the writing of a petition by their private counsel, retained by them to prosecute, and circulated the same among their friends and kinspeople and sympathizers, praying the grand jury of said county to indict the defendant for said homicide; that such petition was presented to the grand jury which returned this indictment with intention to unlawfully influence the grand jury in its deliberation, and to procure the unlawful indictment of the defendant by the grand jury; and that the petition contained unsworn and *ex parte* statements relative to the alleged guilt of the defendant, and was signed by unsworn volunteers, who by this means procured their entry into the consideration of the grand jury, and had their private and personal wishes brought to bear upon the grand jury.

The petition referred to in the motion reads as follows: "To the General Public:

"We, the undersigned residents of the second district of Marshall county, Mississippi, are thoroughly familiar with the fact connected with the killing of Jarrett Kelley by Owens Price on the 2nd day of December 1926, at Mt. Pleasant, Miss., and feel that the ends of justice demand that an indictment be found against him, the said Owens Price; and that he should be brought to trial, and be tried by jury of his peers, and respectfully urged that the mat-

ter be submitted to the next grand jury with this end in view.

"This the 5th day of March, 1927."

In support of the motion to quash, the foreman of the grand jury was introduced and testified that he remembered that there was a petition in the grand jury room, and thought the petition presented him was the one that was there. He was asked the question as to whether the petition was considered by the grand jury, to which objection was made and objection sustained by the court. He testified that the petition was before the grand jury which returned the indictment. The defendant thereupon rested his evidence upon the motion, the court having reserved its ruling on the proof offered, and the defendant then asked to be permitted to reopen the proof on the motion to quash and introduce Mr. Bob Kelley to prove the petition and that it was before the grand jury. The counsel for the state stated, "That is admitted." Whereupon the motion to quash was overruled by the court and exception taken.

It was agreed that there was other testimony before the grand jury which found the indictment. It appears from the evidence that the appellant, Owen Price, shot Jarrett Kelley in the village of Mt. Pleasant in said county, Price firing four shots; two bullets took effect. It appears from the evidence that the wounds upon the body of the deceased were one small smooth hole about three inches from the left shoulder in the front chest; one small, round smooth hole about the same size under the shoulder blade about twelve inches below the neck band of his shirt, and there was one oblong, ragged hole at the edge of the hollow of his neck in front. This probably was the exit of the bullet fired into his back below the shoulder blade. One state witness testified that on the morning of the killing, just prior to it, he and the deceased were standing in front of Cookwood's store, and

deceased was trimming his finger nails with his knife, and that Price drove up in a truck, parked it, and came toward the store. Just before Price got to where Kelley was, the witness turned and went into the store, and immediately he heard a shot and turned to look. Kelley grabbed his chest and turned to run, turned around the corner of the store toward the back and fell. He died soon afterwards.

Another witness for the state testified that he heard the shooting when it started, and turned around and saw Kelley, the deceased, "put his hands over his chest and bend over and broke to run;" that Price was shooting him all the time he was turning; that he ran around the corner of the building, and, when the deceased turned the corner, appellant shot him. Another witness testified that he was in Mt. Pleasant in front of Cookwood's store leaning against the door facing on the south side; that Mr. Price drove up in his truck, and parked twenty or thirty feet from the door; that Mr. Irby Gardner, Fenner Smith, and Mr. Price got out of the truck and came to the store; that Mr. Gardner and Mr. Smith came on in the store, and Mr. Price stepped up on the steps with one foot on the first step and one on the next step; and that he saw Mr. Kelley step from the end of the steps, and Mr. Price whirled and began to shoot. Mr. Kelley ran out by the side of the store, and Mr. Price was shooting the way that he had gone. He further testified that, at the time Price began shooting, Kelley was not doing anything to Price; that Price shot first; that Kelley turned or whirled, and went around the side of the store; that Price stepped off the steps, went to the corner of the store, and shot in the direction that Kelley was going; that, at the time the last shot was fired, the witness could not see Kelley on account of the store.

There was other testimony that, at the time of the shooting, the appellant had started up the steps when he

was accosted by Kelley, and that Kelley approached him with a knife in his hand, drawn in striking position, stating that he wanted to see Price, and that Price fired several shots, and that during this firing Kelley turned and ran.

It appears that on the day before this shooting Price was driving a school truck, transporting children to a consolidated school in the community; that on the road near the house of the brother of the deceased the deceased approached the appellant and accosted him about permitting appellant's children and other children to impose on and run over the sisters of the deceased; that at that time Kelley invited the appellant to get out; that the appellant told Kelley he had the children in charge and this was no time to have trouble. There is some conflict in the testimony as to what happened on that occasion—some of the witnesses say that Kelley stated that he would see him later or the next day—others stating that Kelley said he did not want any trouble either.

The appellant testified that on this occasion Kelley accosted him, using vile language, and invited him to get out of the truck, but that he declined to do so, having the children, and that deceased threatened him by saying that he would see him later in town, or some statement similar to that; that, after this conversation and threat, appellant procured a pistol, apprehending further attack, and on the morning of the killing he had taken the children to Mt. Pleasant and parked his car and started into the store when Kelley accosted him, saying he wanted to see him; that, as he turned towards Kelley, he was approaching with a drawn knife; that he fired three shots, and Kelley turned and ran; and that the fourth shot was fired unintentionally, and did not strike Kelley but struck the ground.

The only serious proposition in the case is whether the court erred in refusing to quash the indictment. It has

been held in a number of cases that the court will not inquire into the legality and sufficiency of the evidence before the grand jury to sustain the finding of an indictment. In *Blowe* v. *State,* 130 Miss. 112, 93 So. 577, 24 A. L. R. 1429, it was sought to quash the indictment found against the appellant in that case on the ground that the evidence upon which the bill was found was procured by means of an unlawful search, and that such evidence was incompetent. Under the Tucker case, *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377, it was held that evidence obtained by an unlawful search was not competent if objected to. See, also, *Williams* v. *State,* 129 Miss. 469, 92 So. 584; *Butler* v. *State,* 129 Miss. 778, 93 So. 3; *Taylor* v. *State,* 129 Miss. 815, 93 So. 355. In these cases it was held that on the trial of a case on its merits such evidence is inadmissible if objected to at the time it was offered, where it was discovered by means of an unlawful search, but the court held in the Blowe case that it could not inquire into the evidence found by the grand jury, the court saying:

" 'The rule in this state is that no inquiry can be made into the evidence on which the grand jury acted in finding an indictment.'

"The question was raised in *Smith* v. *State,* 61 Miss. 754, by plea in abatement to the indictment, which plea set out that the indictment had been found by the grand jury without an examination of any sworn testimony. The court said that the authorities on the question were conflicting, but it preferred those which denied such an inquiry.

"This exact question was involved in *Hammond* v. *State,* 74 Miss. 214, 21 So. 149, but not decided. The motion to quash the indictment in that case was based on the ground that the indictment had been found by the grand jury in whole or in part upon the testimony of the wife of the accused, who under the law was incompetent to testify against her husband."

In *Kyzar* v. *State*, 125 Miss. 79, 87 So. 415, it was held in the second syllabus:

"The court cannot inquire into the character of the evidence before the grand jury upon which an indictment was found, and when a grand jury has been reassembled during a term of court and has returned an indictment upon which the names of witnesses are indorsed, evidence to show that no witnesses appeared before the grand jury on the date it reconvened and returned the indictment is inadmissible."

In *Baldwin* v. *State*, 125 Miss. 561, 88 So. 162, it was again held that the evidence on which the grand jury acted on finding an indictment cannot be inquired into on the trial of the defendant on the indictment. In this opinion it is stated, quoting exactly:

"This is an appeal from a conviction for receiving stolen property on an indictment in which the property alleged to have been received is described as 'certain dry goods and articles of wearing apparel. The exact description, further than this is to the grand jurors unknown.' Each article of wearing apparel alleged to have been received by the appellant is specifically set forth in the testimony of the state's witnesses, two of them on cross-examination testified that an itemized statement thereof was given by them to the grand jury before the finding of the indictment."

The court held that, "the rule in this state is that no no inquiry can be made into the evidence on which the grand jury acted in finding an indictment."

On the other hand, it has been held in a number of cases that it is competent to show unlawful influence operated upon the grand jury and caused the return of an indictment, and that it is competent, on a motion to quash, to show such misconduct, and, if it sufficiently appears and if it was of harmful nature, that the indictment would be quashed. In a case where an attorney appeared for the

prosecution, procuring himself to be summoned as a witness before the grand jury, and there urges the grand jury to find an indictment, it should be quashed. *Wilson* v. *State,* 70 Miss. 595, 13 So. 225, 35 Am. St. Rep. 664; *Welch* v. *State,* 68 Miss. 341, 8 So. 673; *Durr* v. *State,* 53 Miss. 425; *State* v. *Barnett,* 98 Miss. 812, 54 So. 313.

In *Le Barron* v. *State,* 107 Miss. 663, 65 So. 648, it was held that an indictment would not be quashed because of the presence of the district attorney in the grand jury room while the matter was under investigation, and when the indictment was voted on, in the absence of a showing that accused was prejudiced thereby. It was likewise held that where the county attorney was in the grand jury room when the case was under investigation and there was a law creating that office making it his duty to assist the district attorney, that fact was not sufficient ground to consider a quashal of the indictment, unless it appeared that he did something improperly to influence the grand jury. See *State* v. *Coulter,* 104 Miss. 764, 61 So. 706, 44 L. R. A. (N. S.) 1142; *Collier* v. *State,* 104 Miss. 602, 61 So. 689, 45 L. R. A. (N. S.) 599.

In *Allen* v. *State,* 61 Miss. 627, it was held that an indictment would not be abated or quashed because one or more of the grand jury were intoxicated while it was under consideration. In the opinion in that case, delivered by Judge Chalmers, it was held:

"It has never been held here or elsewhere, so far as we can find, that an indictment could be abated or quashed because one or more of the grand jury were intoxicated while it was under consideration by that body. The grand jury is not under the guidance and control of the court, like a petit jury is, while considering of their verdict, and should not be so judged. The plea in abatement was properly demurred to."

In *State* v. *Bacon,* 77 Miss. 366, 27 So. 563, it was held that the presence of a bailiff in the grand jury room dur-

ing a part of its deliberations was not sufficient cause to quash an indictment, and that the presence of an interloper before the grand jury and statements made by him charging the guilt of a person were not sufficient cause to quash an indictment found against such person, in the absence of a showing that such acts and statements influenced the presentation. From the statement of facts set out in the report, it appears that it was set out in the motion to quash that the bailiff was improperly in the grand jury room during the deliberations; and, second, that a person who is not a member of the grand jury, not a witness in the case for any purpose, not subpoenaed before the grand jury, and had no knowledge of any of the facts and circumstances of the homicide, and not related in any manner whatever to the deceased, unlawfully and improperly intruded himself upon the grand jury while investigating and deliberating upon the homicide, and, in a malevolent and vindictive spirit, urged, in strong language the indictment of defendant, insisting that he was guilty of a diabolical murder, and that public sentiment demanded an indictment. On the motion in that case several members of the grand jury were introduced as witnesses, and testified touching the conduct of the bailiff and intruder during their deliberations. The evidence showed that the bailiff was in the grand jury room part of the time and out part of the time; that he was passing in and out; that the intruder applied for admission several times, and was finally admitted by order of the foreman, was sworn, and answered the routine of questions propounded to him; that he made some reference to, but knew nothing of his own knowledge about, the case. Several witnesses testified that the intruder stated, while in the grand jury room, that Bacon ought to be indicted, but the court held that this was insufficient to consider a quasher of the indictment. In the opinion it was said:

"The intruder did not act as district attorney, did not have the witnesses summoned for the state, and did not draw the indictment. The action of the grand jury must be free from malice, prejudice or passion. But its solemn findings are not to be set aside for light or trivial causes, or anything short of a sufficient, substantial showing."

In *People of New York* v. *Shea,* 147 N. Y. 78, 41 N. E. 505, it appeared that a motion was made in that case to dismiss the indictment for murder, on the ground, among others, that certain persons, not officers of the law, had issued and distributed to each person on the grand jury list a circular letter advising them as to their duties, and on other questions prejudicial to the defendant. The motion was based upon affidavits of the defendant and his attorney, and the only fact proved was the distribution to grand jurors of a circular signed by the chairman and secretary of a committee of public safety, reminding the jurors of the importance of their duties, stating some of their powers as evidenced by citations from the statutes, offering to further advise them if they would call at the headquarters of the committee of the methods by which each grand jury could do effective work, and stating that the efforts of the committee were not for political or sectarian effect. The court of appeals held that, assuming it had jurisdiction to review the determination of the court below on this point, which it doubted, there was no ground set forth which was sufficient in law to justify the trial court in dismissing the indictment, and that the defendant had no ground of complaint based upon the denial of his motion, it appearing that there was no proof that any man on the panel was not a legally constituted juror, or even an allegation that the evidence given before the grand jury was incompetent in its nature or insufficient to warrant the indictment.

It will be noted from the statement as to the motion and the petition to the grand jury that it does not appear what activities were displayed by persons who signed the petition in procuring the prosecution, other than the mere signing of the petition. It does not appear that they were persons of influence, and that they had so stirred the public opinion into hostility as to make it reasonably appear that the grand jury would be influenced by the petition. It is stated in the motion that the petitioners were relatives and friends of the deceased. There were only twenty-four of these signers, and it probably is true that they were all living in one locality in the county. It does not appear that any of them appeared at the grand jury room, or were admitted as witnesses, or exerted any influence apart from the mere signing of the petition. It does not appear from any affirmative proof that the grand jury was influenced in any degree by this petition. The jury laws require a selection of men of good intelligence, sound judgment, and fair character, and, if the grand jury was composed of such men, and we must presume that it was, it is not likely that it would be unduly influenced or swept off of its course of rightful conduct by the mere fact that a petition, signed by twenty-four persons, friends and relatives of the deceased, requested the investigation and indictment of the defendant. The court must indulge the presumption that the grand jury is composed of men who have a reasonable degree of intelligence and would perform their duties in accordance with the law and the evidence before them.

It does appears that there was other evidence before the grand jury. It would be adopting too rigid a rule to apply to the grand jury the strict rules applied to a trial jury in the trial on the merits. The grand jury is an independent body, and its members are not usually versed in legal rules of procedure and evidence. It is probably

true that in each county in the state the grand jurors are approached and talked to by the citizens with a view of having certain conditions investigated and proper indictments returned. The members are not restrained during their investigation, but go at will amongst other people during their work. While it is important that it be free from improper influence, yet it is conducted on the plane of common everyday experience and common sense, and, if an indictment could be quashed merely because some person got up a petition, or wrote a letter, which got into the grand jury room, or who had merely talked to members of the grand jury in reference to cases to be investigated, it would result in practically nullifying all the indictments found by the grand jury. Courts may be presumed to know what is matter of general information, and it is a matter of common knowledge that in many of the investigations of the grand jury there are partisans on both sides present—some seeking to have the prosecution instituted, and others, seeking to prevent that action being taken. If an indictment, after being found, can be quashed on the facts now before us, it would be an easy matter for designing persons, having interest in the defeat of the law, without any actual consent or connivance of the defendant, to procure petitions, letters, and other improper matters to get into the grand jury room; while at the same time others interested in defeating justice would be active in using whatever influence could be brought to bear to prevent an indictment, and, if one was presented, then the defendant could be informed of what had been done and make motion to quash, and thus delay and defeat the purposes for which the grand jury was instituted. It is to be recognized that a person is not to be presented by coercion of a grand jury or by undue influence and misconduct, but before an indictment is quashed it should clearly appear that the grand jury did not perform its duties fairly and im-

partially, and with due regard for the public welfare, but that they were subjected to such influence and improper conduct as makes it clearly appear that the indictment was coerced or improperly procured. Every man with common sense must know that, when a homicide is committed, the family and relatives of the deceased are desirous, as a rule, of procuring an indictment and having the matter tried in a public trial in the courts; while at the same time the family and relatives and friends of the defendant take a contrary view and that no indictment should be had.

There is a marked difference between the rigid rules applying to the trial of cases on the merits before a jury and the practice and rules applying in the work of the grand jury, and we should do nothing that would render the fair and honest work of the grand jury nugatory. Before we quash an indictment upon circumstances similar to the ones before us, it must appear affirmatively that improper influences operated, and that they were effective in procuring the indictment. It is not an uncommon thing for an indictment to be defeated by friends of the defendant, and sometimes a subsequent indictment is found when such influences are removed or overcome by counter influence. The action of one grand jury does not exclude another from action on the matter if the offense is not barred by the Statute of Limitations. We think the showing here made fails of the requirements of law in showing that the indictment was unlawfully procured, and that the motion to quash was properly overruled on the showing made in the record.

The other assignments of error have been considered, and are considered to be without merit; the principles underlying all of them having been practically settled by previous decisions of the court. We will say, however, that no distinction appears to us to be found between the contention here that on an indictment for manslaughter evidence that would make a case of murder should

not be admitted, and the cases in which it has been decided that a conviction of manslaughter on an indictment for murder, where the evidence makes a case of murder, is harmless error as to the defendant, being beneficial rather than detrimental to him. In the case before us the indictment was for manslaughter. The state, by its proper authorities had elected to charge the crime committed, on the facts produced, to be manslaughter instead of murder. That election, of course, is binding upon the state, and no subsequent indictment involving the same facts for murder could be found. On a manslaughter indictment the question is whether the killing was unlawful or lawful. Anything that tends to show that it was unlawful, when competent and relevant, is admissible in evidence in such case, and the fact that the evidence, or some of it, might make out a case of murder or tend to do so, does not prevent it being received on a charge of manslaughter when the state has elected to presecute for manslaughter only. The judgment of the court below will therefore be affirmed.

*Affirmed.*

Cook and McGowen, JJ., concur.

Smith, C. J., and Anderson, J., dissent.

Griffith, J. (dissenting). After a dilligent search, we have failed to find a reported case of this exact kind. It is to be fairly assumed therefore either that never before in this country did temerity become so bold as to present, into the very presence of a grand jury then and there assembled in its responsible deliberations, a written petition for the purpose of working an indictment to gratify personal hatred or private revenge, or else that never before did such a proceeding fail to meet the condemnation of a quashal by the trial court and before reaching the court of last resort. It produces an occa-

sion when, as said in a case on the same general subject by the supreme court of North Carolina, there is serious need to review the ground and to recur to original and fundamental principles.

The right of the people to petition the government, secured by both our Federal and State Constitutions, was never intended or even thought of in any quarter or in any patriot's mind as having any application to the judicial department of the government. It was the sole purpose in the security of that right that the wishes and sentiments of the people or of a part of them might be presented to the political departments, but emphatically not to any department which is judicial. As said in *Clair* v. *State,* 40 Neb. 534, 58 N. W. 118, 28 L. R. A. 375: "Public sentiment in a representative government controls in the solution of political questions, but we recognize in it a dangerous force when it seeks to dictate judicial decisions. So potent is this proposition that further discussion of the question"—as that court thought—"is deemed superfluous."

If the people of this nation should upon opening their morning papers read that the supreme court of the United States had on the previous day assembled to hear the presentations of petitions, or to receive a delegation of persons not parties to the case, demanding or requesting that the court in a pending cause, or one about to come on for hearing, should decide that cause in a certain way, and if upon recovery from the shock of incredulity thereby engendered it should be discovered that the news was accurate and true, there would be no going about the business and occupations of the day in contentment that, regardless of petitions or delegations, that great court is composed of fearless men of the highest and most irreproachable characters, and that they would not be influenced by petitions or walking committees. It would be intuitively known by even the unlearned who yet had intelligence enough to understand the meaning of the primary

elements of free institutions in this county that something invaluable to him and beyond price to all his succeeding generations had gone irretrievably wrong, and to those who had read the histories of the centuries gone by, and understood how it was that this nation had become the greatest on earth, there would be an instant appreciation of the fact that our "grand experiment" had become only an experiment, that the break had come, and that already the structure was crumbling back to earth. And all this, not that the people at large would be concerned in the case involved, but because of the portentous meaning of the fact, and of the fact alone, that the court had heard the petitions or received the delegation at all.

And, could it be conceived that such a thing could ever be possible, if we here in our state supreme court, bound as we are on our oaths to maintain the Constitution, and every right of every man within our jurisdiction under that Constitution, according to the "best of our ability and understanding"—not according to the wishes or understanding of petitioners and delegates—should open our sessions to the presentation of petitions or to delegations of designing intermeddlers or of partisans or vengeful persons, or should receive the like, or anything howsoever remotely of the like in our consultation rooms or even in our private offices, and if all the courts of last resort throughout the nation should follow the same course, or if in trials in the courts of original jurisdiction, in the circuit, or chancery, or county, or even in a justice of the peace court, it would for a moment be permitted that delegations should intrude themselves and there demand or petition or request regardless of the manner, or even when the demands or request should be by way of the covert and insidious method of petition alone, that a certain result or results should be reached, whether the trials be regarding mere property or whether the freedom of life of the most friendless and degraded

wretch in the confines of the whole state is involved—if these things should go on, and the people could find no means of relief to correct a practice so subversive and destructive of their rights and freedom, it would be time to end the pretense of constitutional government and close the doors upon judicial courts.

And where, it is asked, is all this to be the less regarded, in fundamental substance, when it comes to the solemn returns of a grand jury—a constitutional arm or branch of the circuit court, a court which more than any other touches so closely and reaches down so deeply into questions upon the lives and liberties of the people. "The finding of an indictment by the grand jury, like the verdict of a petit jury, is a jural act." 5 Wig. Ev., section 2364.

When the founders of our government came to the actual performance of their task, they did not enter upon it by the impulse of the moment or by what they had learned only in their own generation. They had informed themselves and took an understanding that embraced every page of the history of the struggles that had brought their forefathers hither, and knew definitely what had been the instrumentalities by which government had the pretense of government had misgoverned men for all the cruel years that had preceded their time. They knew and fully understood that it was not only by denying trials by jury and by the delay of trials that mankind had suffered many, if not most, of the miseries of the past, but that, more potent and dangerous than these, there was the irresponsible opportunity to oppression in the power to prosecute by information—the power by which some executive or political officer could by written information under his hand, and upon pretense of law enforcement, have a political opponent, or a personal enemy or any other person objectionable to him or to those who controlled, or influenced or incited him, thrown into a dungeon from which the unfortunate victim

never emerged again. The lessons of history, paid for at such a price, were not forgotten, nor the least overlooked; and thus in our Federal Constitution and in the first Constitution of our own state, and in every one of its Constitutions, including the present there are plainly written those guaranties and limitations, not only that a person accused shall have a speedy trial, but that he shall have a fair and impartial trial by a jury fairly selected, that he shall be confronted by the witness against him, that he shall not be compelled to testify against himself, that the verdict of the jury shall be unanimous, that he shall be informed of the accusation, its nature and grounds, and, although mentioned here last, it is not the least, but is in fact the first in sentiments of enlightened liberty, that he shall not be proceeded against criminally for any alleged felonious offense except upon a true bill returned into open court by a grand jury.

And we do not have to go to any other jurisdiction than our own to learn what that constitutional guaranty was intended to mean, and what in its rich and full fundamental substance it does mean. In *Wilson* v. *State,* 70 Miss. 595, 13 So. 225, 35 Am. St. Rep. 664, in an opinion written by Justice COOPER, an opinion which we take pride in here noting has been perhaps more often quoted and approved by jurists and commentators than any other anywhere on this subject, it was said:

"It is a serious mistake to suppose that the right of one accused or suspected of crime to the orderly and impartial administration of the law begins only after indictment. Immunity from prosecutions for indictable offenses, except by presentment by the grand jury, is declared and preserved by the organic law of this and all the other states, and, though, by reason of the secrecy of the proceedings before that body, its action is seldom brought in review, it cannot be doubted that one whose

acts are there the subject of investigation is as much entitled to the just, impartial and unbiased judgment of that body as he is to that of the petit jury on his final trial, nor that it is as essential before the one body as the other that private ill will or malevolence shall be excluded.''

It had previously been said by another of our great judges, Judge CAMPBELL, in *Welch* v. *State,* 68 Miss. 341, 8 So. 673:

''Improper influences to secure an indictment may be inquired into, and should be, when properly alleged. In vain the constitution protects against being proceeded against criminally, by information, for an indictable offense, except in cases mentioned, if grand juries are to be swayed by malice or prejudice, or subjected to other influences than those recognized by law as legitimate and proper to guide them in their secret inquest. 'The recognition of such a mode of reaching grand juries (as was alleged in this case) would introduce a flood of evils, disastrous to the purity of the administration of criminal justice, and subversive of all public confidence in the action of these bodies.' It is true that one indicted is to be tried by his peers, and if falsely accused may expect a deliverance, but he, is entitled to attack the prosecution in limine, where it is procured by means unknown to and unsanctioned by law.''

There had been former decisions to the same effect cited in the briefs and opinions in the two cases mentioned; but the same adherence to principle has been reaffirmed in subsequent cases. In *Fuller* v. *State,* 85 Miss. at page 207, 37 So. 751, it is said:

''The deliberations of the juries, both grand and petit, must be preserved inviolate from all outside influences, no matter from what source they emanate.''

In *Blau* v. *State,* 82 Miss. at page 520, 34 So. 153, it is said of the grand jury that it stands as a co-ordinate

branch of our criminal jurisprudence, and that, if it should be influenced in its findings by courts, officers, or laymen, the way would be paved to influence its findings by corrupt means; that there would thus be placed "the entering wedge, which goes to the foundation of the liberties of the people. . . . We must keep 'that body' pure, its findings unaffected by power, fear, sympathy, or public sentiment. In that way only can it protect the rich, the poor, the humblest and the greatest in the land alike." In *Collier* v. *State,* 104 Miss. 602, 61 So. 689, 45 L. R. A. (N. S.) 599, after a full review of all the cases, our court said:

"The purpose of the law is to prevent outsiders from taking any part whatever in the deliberations of the jury, and to prevent them from influencing the jury in any manner and to any extent in their effort to reach proper conclusions. . . . We emphatically disapprove of all interference or influence by outsiders with the grand jury during its deliberations. Its members should be permitted to act free from sway or control from any source. As an informing and accusing tribunal it has an important and solemn responsibility. It owes a duty to the state and a duty to the citizen. Its performance of these duties should be without fear or favor, or any other manner of influence."

And these are not the only cases to the same effect in our own court. If human language could make the principle any clearer than the words taken from the foregoing opinions, it would be difficult to select those that would do so. And the decisions of the courts everywhere are to that effect. One of the leading American cases on the subject, one almost as often quoted as our own case of *Wilson* v. *State, supra,* is the opinion in *Lewis* v. *Board,* 74 N. C. at page 199, where it is said of the grand jury that "their findings must be their own, uninfluenced by the promptings or suggestions of others, *or*

*the opportunity thereof.''* And that court said further: ''We know there have been wide departures from the principles here announced. . . . It has become necessary, therefore, to review the ground, and recur to the earlier and more correct practice as it was established by those who have gone before us.'' Such are the principles laid down, and adopted by quotations, in the text of Joyce on Indictments (2 Ed.), sections 144-148. See, also, *State* v. *Ernster,* 147 Minn. 81, 179 N. W. 640; *Hartgraves* v. *State,* 5 Okl. Cr. 266, 114 P. 343, 33 L. R. A. (N. S.) 568, Ann Cas. 1912D, 180; *State* v. *Wetzel,* 75 W. Va. 7, 83 S. E. 68, Ann. Cas. 1918A, 1074; *Latham* v. *U. S.,* 226 F. 420, 141 C. C. A. 250, L. R. A. 1916D, 1118, and the cases collected and cited in the annotations to the last three cases, *supra.*

It is not to the point, when we are here discussing a fundamental question, and not one of failure to observe ''technical requirements and formalities,'' that inquiries may not be made into whether an indictment has been found upon incompetent evidence, or upon illegal evidence or on none at all, or into the character of the evidence, or whether one of the grand jury was intoxicated. Nor are cases in point which hold it immaterial that the district or county attorney was present, since the law itself so allows and contemplates, provided they do nothing personally to influence the jury. Nor is the case of *State* v. *Bacon,* 77 Miss. 366, 27 So. 563, available against the fundamental constitutional principle, the preservation of which is being contended for here, for in that case there was involved only the occasional presence in the grand jury room of a garrulous and irresponsible bailiff, whose irresponsibility was known to all, who had no knowledge whatever of the case, and then admitted that he had none; and, upon the motion to quash, *there was a full development of all the facts about the matter,* whereupon at the very opening of the opinion of

the court in that case it is stated: "The *proof clearly* shows that the bailiff exerted no influence on the grand jury." Here in the case at bar it is admitted that a petition claiming knowledge of the facts and urging the indictment of the appellant was presented in the very presence of the deliberations of the grand jury, a thing that was not only a criminal contempt of the court, but was in itself an independent crime known as the crime of embracery; and yet it is argued that the indicted person must himself show and show clearly that it was harmful. It being a crime and a contempt of court, the fact of the reception of it raises a sufficient presumption that it was harmful, and it is as far beside the fundamental point at issue here upon the taint thereby produced, in the indictment presently following, to talk of whether it was harmful, as it would be upon the known presence of taint of blood that a discussion should follow whether it was harmful. Nor, in such a question, should arguments as to expediency, or public convenience, or the necessities of the purposes of prosecutions for crime, be considered for a moment. These are quasi political arguments, run at last to the extreme that the end *excuses,* and hence justifies, the means, and were the asserted considerations exactly upon which tyrants in the past made most of their tyranny.

But conceding that the taint may be removed, the fact of the presence of the said petition being proved, in fact admitted, the burden thereupon and thenceforward of showing the absence of harm, if it could be shown, was upon the state, and it failed to so show or even to attempt so to do. In this connection the language of the opinion in the Massachusetts case, *Comm.* v. *Harris*, 231 Mass. 584, 121 N. E. 409, quoted and adopted in Joyce on Indictments, p. 179, is strikingly applicable:

"The contention of the Commonwealth that the burden is upon the defendant to show he was injured by action

of the grand jury is unsound, because in the nature of things it would be impossible to prove the fact if true before the jury trial and because the wrong complained of is the violation of a substantial right guaranteed by the Bill of Rights, and is not a mere failure of the grand jury to observe technical requirements and formalities. . . . We think it wise to continue to follow the well-settled methods of procedure which were adopted at and have continued since the settlement of this Commonwealth.''

It is fixed as a rule of law in this state that a grand juror may not be introduced as a witness to impeach his indictment, see cases cited in *Collier* v. *State,* 104 Miss. at page 609, 61 So. 689, 45 L. R. A. (N. S.) 599, and, since none except the district or county attorney may be lawfully in the grand jury room when an indictment is voted, the defendant is therefore without lawful means to make the proof so far as concerns this issue of harm, however true it might be that the proof, except for the disqualification of the grand jurors, would be overwhelmingly ample. So that to say to the defendant that he must clearly prove the harm, and at the same time say to him, as the law does say, that he cannot introduce a grand juror to prove it, is effectively to say to him that, although he must prove it, the law by reason of withholding the only available witness from introduction on his part, will not allow him to prove it. But the state is not thus hampered; it may introduce the grand jurors and show by them, if it be a fact, and they can so say on their oaths, that no influence was exerted by the criminal interference, whereas, if they cannot say so and will not swear it, then they will remain off the witness stand, and the indictment will be quashed, as in such a case it so well deserves to be. If they are fair men of good character and sound judgment, it would be an easy matter for them to disclose when introduced by the state that no

influence was exerted, and their oaths to that effect might be received with at least some more satisfaction than nothing at all, and, if not the men of good character as assumed and were in fact influenced, a proper cross-examination of them would tear the mask from their unworthy faces. Certainly it ought not be contended that the rules of law in prosecutions of crime are less liberal to defendants than are the general rules of evidence, even in civil cases. It is a familiar general rule of evidence that, where the testimony to prove a fact is chiefly, if not entirely, within the control of one party, the burden rests upon him to produce the evidence. 22 C. J., p. 81; 2 Ency. Ev., p. 809; 2 Jones Com. on Ev., p. 885 et seq. The authority of the text last cited is to the effect that, when one party, even if technically the burden of proof is upon him, has made out a case *prima facie* by the production of such proof, as he is fairly able to produce, then the opposite party who has the better means to clear the situation must proceed to do so, or else suffer the presumptions arising from the failure so to do.

The indictment here should be quashed and another found in a clean and lawful way. Circuit courts have the power to regulate these matters, and should be required to do so. If not, the grand jury ought to be abolished and some means be found, as has already been done in some states, to cure the evils that such a thing as appears in this case will inevitably lead to. What should be done here is what is suggested in the case of *Boyd* v. *U. S.*, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, in which the court used this language in a matter similar to that which we have now before us: "Illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.

. . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*" So much was said—resist the first beginnings—of a silent approach and a slight deviation; and, if so, what is to be said of the stealthy, insidious, and criminal method of approaching a court or a constitutional branch thereof by the intolerable and abhorrent means of popular petition?