# STATE *v.* OWEN.

(Division B.   Feb. 3, 1930.)

[126 So. 25.   Nos. 28116-28124.]

**Forrest B. Jackson,** Assistant Attorney-General, for the state.

**Francis Harmon** and **T. J. Wills,** of Hattiesburg, for the state.

**Currie, Stevens & Currie,** of Hattiesburg, for appellee.

R. L. Bullard, of Hattiesburg, for appellee.

Anderson, J., delivered the opinion of the court.

Appellee, a justice of the peace of Forrest county, was indicted for the crime of extortion in office at the April, 1929, term of the circuit court of that county. Ten separate indictments were returned against appellee, charging him with as many separate acts of extortion. Ap-

pellee made a motion to quash all the indictments, the ground of the motion being common to all. The ground was that improper outside influences had been brought to bear on the grand jury to find the indictments. The evidence as to the alleged outside influences was the same as to each indictment. The motion to quash was sustained, and from that judgment the state appeals.

Appellee, in his motion to quash, charged that at least two distinct outside influences were brought to bear on the grand jury to return the indictments. The conclusion we have reached renders it necessary to consider only one of them, namely, the action of the Forrest County Bar Association, and of a committee of that Association, appointed to investigate and report to the Bar Association any illegalities in the administration of the laws by the justices of the peace of that county.

A few days before the indictments were returned against appellee, the Forrest County Bar Association, composed of thirty-odd lawyers, held a meeting, at which it authorized its president to appoint a special committee, ''with instructions to investigate illegalities in procedure and practice in connection with the administration of justice in the justice of the peace courts of Forrest county.'' The Bar Association instructed the committee to report its findings to the Association. The president appointed as members of this committee seven members of the Bar Association. This special committee proceeded at once to carry out its mission. After making the investigation required of them, they reported their findings, embodied in thirteen type-written pages, in which it was set out that appellee and L. Korndoffer, justices of the peace of the county, and B. O. Doherty, a constable of the county, had been guilty of various acts of extortion in office, and in connection therewith set out the evidence on which the committee relied as constituting the offenses. The following are two paragraphs of the report.

"Your committee reports these flagrant violations of the law, confident that the Forrest County Bar Association will desire to take further steps to see that these evils are corrected and these who are guilty of violations of the law are brought before the bar of justice. To this end, the committee requests permission to present the results of its investigation to the grand jury now in session, as the duly authorized committee of the Forrest County Bar Association, and the members of the committee tender their services for any further labors which the Association desires them to make in regard thereto."

"With regard to the specific charges respecting Justices of the Peace A. H. Owen and L. Korndoffer and Constable Doherty, we tender our services to the Forrest County Bar Association in the carrying out of any mandate which the Association may wish to give us. With regard to the remaining recommendations in our report, we submit them for such action as this honorable body may choose to take."

The report was signed by the chairman and secretary of the committee.

While the grand jury was considering whether they would find and return indictments against appellee for extortion in office, there were three copies of this report to the Bar Association in the grand jury room.

On the motion to quash, Mr. Hosey, the district attorney of the judicial district in which Forrest county is situated, was called and testified as a witness on behalf of appellee. The questions propounded to the witness, and his answers thereto, on direct examination, were as follows:

"Q. Your name is G. W. Hosey? A. Yes.

"Q. District attorney for this district, and particularly for Forrest county? A. Yes—the Twelfth judicial district.

"Q. District attorney on the 15th day of April, 1929? A. Yes.

"Q. That is the date the recent grand jury convened? A. What date?

"Q. 15th day of April. A. I think that is correct.

"Q. As a matter of fact you have been district attorney in this district—how long? A. Little better than one term.

"Q. District attorney the time the recent grand jury of Forrest county was investigating cases of the State v. A. H. Owen—eleven indictments being returned, numbered from 1545 to 1555, inclusive, being ten charges of extortion, and one of profanity—and other cases here against the other defendants, which are involved in this motion? A. Yes.

"Q. I will ask you to state whether or not, in the discharge of your duty, you were in the grand jury room on April 15th, the day of the convening, and days subsequent thereto. A. Almost continuously for the six days in session; it convened on the 16th day, I think, and adjourned on the following Monday about four o'clock.

"Q. State whether or not you have in your possession now, or know where we can get possession, of the original committee report submitted by T. J. Wills and Francis H. Harmon. A. I have a copy that was handed to me, but whether that is the original or not I don't know.

"Q. Was it a signed copy? A. Yes; signed by T. J. Wills, Chairman, and Francis H. Harmon, secretary.

"Q. State whether or not you heard me read the report attached to the motion here as exhibit. A. I did.

"Q. Is that a copy of the same as the one you have? A. Yes.

"We charge in our motion here that that committee report, copy of which you have, got into the grand jury room either on the 15th day of April, day of convening of the grand jury, or some day subsequent thereto, while in session in considering charges and returning charges against A. H. Owens and others in these cases involved in this motion; state what knowledge, if any, you have

about the entry of that report into the grand jury room, what, if anything, was done with it, and who had it there, and what that person said in regard to it. A. Mr. Currie, as to these particular cases under investigation, I think it is my duty to answer, but as to any other investigation I don't want to divulge any of the secrets of the grand jury. For the sake of brevity, I will make a statement as to what I remember about it, and then you can ask me any question. I came here on Monday morning; there was a great deal of feeling around the courthouse, and I realized that things had to be handled before the grand jury carefully. I also had read the papers, and had read about this committee report. I was requested by several parties, names of whom I shall not mention, to subpœna *this special committee* before the grand jury; I did not do so until I think it was Friday morning; however, I spoke to two of them and told them perhaps we would call them or need them before the grand jury, and I think that was either Tuesday evening or Wednesday morning, I'm not certain which. There had been some talk— and I say this frankly—and it had gotten into the grand jury room in the minds of one or two, that D. W. Holmes, county prosecuting attorney of Forrest county, and I, as district attorney, were opposed to any indictment; when that came to my knowledge I threw the grand jury door open, and on Thursday morning I was handed this report here of the committee to the Bar Association. I left it that night in the sheriff's office, as I didn't want to lose it—or the clerk's office, I forget which. I understood a copy was handed to Mr. Holmes the same day. On Friday morning I had issued subpœnas for T. J. Wills, Francis H. Harmon, Joseph A. Smith, and Earl Wingo. Mr. Harmon appeared and was taken into the grand jury room, Friday morning, about ten o'clock. At that time this report was not in there; I had mine in

my pocket, and Mr. Holmes, I understood, had his in his office. I was in the grand jury room part of the time and Mr. Holmes part of the time was in there. All legal questions which came up were referred to me or Mr. Holmes, as to what the law was, and I endeavored to make answers thereto. Mr. Harmon, while in there, never attempted to tell the grand jury what the law was, but he did have this report and read it to the grand jury. After that I gave one of the grand jurors the one I had, and later on the one Mr. Holmes had was in the grand jury room. That evening the grand jury adjourned over until the following Monday morning, when they reconvened. The indictments mentioned here in this matter were voted on Monday morning, between that morning and late evening, and returned into open court about five p. m., as well as I remember. The report here to the Bar Association was discussed freely in the grand jury room.

"By Mr. Currie: Q. I believe you said in all three copies of the report came into the grand jury room and into the hands of the men? A. I saw three copies in there at one time. I thought I had all three copies, but I was mistaken; you will find the one you have attached to your motion was before the grand jury, and here is another, and the other one I don't know what became of it.

"Q. You stated that Mr. Harmon appeared before the grand jury; that is Francis H. Harmon, who is mentioned in this motion, and who is the editor of the Hattiesburg American? A. Yes.

"Q. And special prosecutor—has been prosecuting these cases? A. I would not say that of my own knowledge I understood it was published in the paper, but I have not seen him prosecuting, and I would not swear to what the newspaper said.

"Q. But the Francis H. Harmon is the same one mentioned here? A. Yes.

"Q. You stated that he had a copy of the report and read it to the grand jury? A. Yes; I know he read that part of it.

"Q. That part that pertains to these cases? A. It is all pertaining to these cases. That part that I remember is the last part of this report; I know he read that part; how much of it I will not be able to say now.

"Q. You say the report was freely discussed in there? A. Yes.

"Q. Are you personally acquainted with the gentlemen whose names are mentioned in the face of that report, starting with the chairman, T. J. Wills? A. Yes.

"Q. Do you know of your own knowledge whether it is a fact that he is one of the most prominent members of the bar, and for that matter one of the most prominent citizens of Forrest county? A. Yes; I know that he is shown as chairman.

"Before his name the name of S. E. Travis is mentioned; do you know of your own personal knowledge whether it is a fact that Mr. Travis is also a very prominent citizen? A. Yes; he is also a leading attorney of the state.

"Q. Do you know F. C. Hathorn, attorney? A. Yes.

"Q. He is also a member of the bar of long standing? A. Yes; prominent attorney of Mississippi. So is Mr. Harmon a member of the bar.

"Q. Francis H. Harmon, mentioned in that report, is the one, the same one, that appeared before the grand jury? A. Yes.

"Q. And the same that edits the Hattiesburg American? A. Yes.

"Q. Is he the same one that was formerly Assistant Attorney General of the state of Mississippi? A. Yes.

"Q. I will ask you to state, if you remember, whether or not, on reading this report to the grand jury, Mr. Harmon took it up paragraph by paragraph and com-

mented on it? A. On the report, I don't know; but he commented on the different testimony he had there, and some exhibits.

"Q. The exhibits to his report? A. No; some other papers he had; I don't remember that he had but one exhibit to the report.

"Q. Then, in addition to this report, he had some other papers? A. Yes; he had a file of them; some were affidavits.

"Q. You know whether or not included among the affidavits was one of F. L. Windham? A. I don't know, but I think there was.

"Q. You know whether or not the file he had in the grand jury room included the paper clippings? A. I don't know; there was some clippings in there, but who carried them in I don't know. I know I did not, and I am sure that D. W. Holmes did not.

"Q. But they were there? A. Yes; they were on the table in the grand jury room.

"Q. They had been there during the time the grand jury was deliberating? A. They were there the last day, I know.

"Q. You are more or less familiar with the personnel of the Bar Association? A. I know every member of it.

"Q. You don't know the exact number, but pretty large, is it not? A. About thirty-five or forty; maybe forty-five.

"Q. Included in that number, is it not a fact, some of the most prominent and influential citizens of the county and state? A. Yes; I consider it one of the strongest bars in the state.

"Q. And its opinion on any subject is calculated to carry great weight and influence? A. Yes; I should think so.

"Q. Do you know whether F. L. Windham was ever before the grand jury? A. Yes.

"Q. You know whether or not he was there at the time these newspaper articles were? A. I don't know; I don't know when the papers got in there."

Upon cross-examination, the witness testified that Mr. Harmon did not read all the report to the grand jury while he was present, but only a part of it. Mr. Harmon and other witnesses testified. There was no material conflict, however, in the evidence of any of the witnesses as to what occurred in the grand jury room. In other words, the testimony of the district attorney, Hosey, stands in in the record without any material dispute.

Was the presence of this report in the grand jury room, and its consideration by the grand jury, a matter of such a character as to vitiate the indictments returned against appellee? Without hesitation, we answer the question in the affirmative. An organization of the legal profession in any community ought to be, and often is, a very powerful influence in such community. The Bar Association of Forrest county, the evidence showed, was composed of thirty-odd lawyers, several of state-wide reputation in their profession. The members of the bar, under our system of jurisprudence, are officers of the courts in which they practice. Being learned in the law, they know when the law has been violated. The committee of the Bar Association, after a thorough investigation, charged appellee in their report, with various and sundry acts of extortion in office, and the report set out the evidence in detail on which such charges were based. The secretary of the committee went before the grand jury with one of the reports, and read parts of it to the grand jury; in addition, there were two other copies in the grand jury room. The district attorney testified, as shown above, that the report "was discussed freely in the grand jury room." It is hardly conceivable that any influence more powerful could have been brought to bear upon the grand jury to return the indictment against appellee.

The law prohibits outsiders from taking any part whatever in the deliberations of the grand jury. The members of the grand jury should be permitted to act entirely free from any outside influence or control. The grand jury is a co-ordinate branch of our criminal jurisprudence. If the grand jury were permitted to be influenced by outside means, although with the best of motives, the way would be paved for outside influences with bad motives. The findings of the grand jury must be unaffected by fear, sympathy, or public sentiment. The Bar Association and its committee no doubt had the very highest motives behind their acts; but their motives must be disregarded. If the door of the grand jury room is opened to righteous outside influences, this would be an entering wedge for the admission of corrupt outside influences. If the law and order league is permitted to enter, then sooner or later the league against law and order will find its way in. It is hard to tell sometimes who is for law and order and who is against. Not all are righteous who wear the cloak of righteousness. There is only one safe, sound rule, and that is to close the door of the grand jury room tight against all outside influences. The investigations of the grand jury should be confined strictly to the testimony of witnesses having a knowledge of the facts touching the matters under inquiry. The report of the committee of the Bar Association necessarily embodied principally, if not exclusively, hearsay evidence; and the same is true of the statements made by the secretary of the committee before the grand jury. It is very clear that under the following decisions of our court the indictments against the appellee were properly quashed: Welch v. State, 68 Miss. 341, 8 So. 673; Wilson v. State, 70 Miss. 595, 13 So. 225, 35 Am. St. Rep. 664; State v. Barnett, 98 Miss. 812, 54 So. 313; Collier v. State, 104 Miss. 602, 61 So. 689, 45 L. R. A. (N. S.) 599.

Price v. State, 152 Miss. 625, 120 So. 751. 755, was a very different case from this on its facts. The line of

demarcation was very distinctly marked out in the opinion in that case, in the following language: "It does not appear that they [petitioners] were persons of influence, and that they had so stirred the public opinion . . . as to make it reasonably appear that the grand jury would be [reasonably] influenced by the petition. It is stated in the motion that the petitioners were relatives . . . of the deceased. There were only twenty-four of the signers, and it is probably true that they were all living in one locality in the county. It does not appear that any of them appeared at the grand jury room, or were admitted as witnesses, or exerted any influence apart from the mere signing of the petition."

Affirmed.