IRVING, J.,
for the Court.
¶ 1. Corey Barlow was convicted by a Lincoln County jury of one count of possession of cocaine with intent to distribute while in possession of a firearm and one count of conspiracy to distribute cocaine. For the possession count, he was sentenced to an enhanced term of fifty years in the custody of the Mississippi Department of Corrections. Barlow was also sentenced to ten years on the conspiracy count. After Barlow serves forty-seven years, the remaining thirteen years will be served on post-release supervision. Aggrieved, Barlow appeals and asserts numerous issues, which we recast as follows: (1) that the roadblock that led to his arrest violated his Fourth Amendment rights, (2) that Officer John Purser did not have the authority to stop him, (3) that the trial court erred in refusing to suppress the statements he allegedly made, (4) that the trial court erred in refusing to strike certain portions of the indictment, (5) that the trial court erred in allowing the jury to hear that he had a prior conviction and was on parole at the time of this incident, and in allowing the jury to hear improper statements by the prosecutor in his closing argument, (6) that the trial court erred in allowing a witness to provide expert testimony, (7) that the trial court erred in its instructions to the jury, (8) that the evidence is insufficient to sustain his conviction, (9) that his sentence violates the Eighth Amendment, and (10) that the cumulative effect of the errors mandate reversal of his conviction.
¶ 2. Finding no reversible error, we affirm Barlow’s conviction sentence on both counts.
FACTS
¶ 8. On March 1, 2004, Purser, a field officer with the Mississippi Department of Corrections, received an anonymous tip stating that Barlow was living on Beard Road in Lincoln County and that he and Thomas McWilliams were in possession of a large amount of drugs. In an effort to confirm the information, Officer Purser contacted the Lincoln County Sheriffs Department (Sheriffs Department) and asked it to assist him in locating Barlow. Purser and officers from the Sheriffs Department went to the residence on Beard Road; however, no one was there.
¶ 4. The next day Officer Purser received a second anonymous tip informing him that Barlow would be going to the residence on Beard Road sometime that afternoon and that drugs would likely be in his vehicle and residence. During this time, Barlow was on parole for possession of marijuana with intent to distribute. Officer Purser attempted to contact Barlow’s field officer, Tanya Thompson; however, she was not available. As a result, Officer Purser spoke with Greg Ferrell, a field officer in Copiah County, who informed him that Barlow had previously failed drug tests.
¶ 5. Officer Purser and officers from the Sheriffs Department returned to the Beard Road residence, and again Barlow was not there. Officers from the Sheriffs Department then set up a roadblock on the road that leads to Barlow’s residence.[1] About an hour later, Barlow and McWil-liams approached the roadblock. Officer Purser was positioned at the opposite end of the road from where Barlow entered the roadblock, but he quickly went to where Barlow had been detained. Barlow and McWilliams were asked to exit the vehicle, *200 and while McWilliams was doing so, drugs fell out of the car.[2] McWilliams also had approximately two thousand dollars on his person.
¶ 6. Dustin Barefield, a major with the Sheriffs Department, participated in the search and testified on behalf of the State.[3] Major Barefield stated that he read Barlow and McWilliams their Miranda rights[4] after the drugs fell from the car. Officer Purser confirmed that Major Bare-field read Barlow his rights. Major Bare-field also testified that McWilliams claimed that the drugs belonged to Barlow and that Barlow agreed. He also stated that after he read Barlow his rights, he asked him whether he had any more drugs. Barlow then informed him that another bag of drugs was in the vehicle and that additional drugs could be found at his nearby residence. Major Barefield stated that McWilliams and Barlow verbally consented to the search of the residence, and McWilliams later signed a consent to search form at the Sheriffs Department. He also stated that Barlow agreed to lead the officers to the house where he told them that he had been residing for three weeks prior to this incident. Upon arriving at the residence,[5] Major Barefield stated that Barlow led them to a room where he showed them a cabinet which contained what Major Barefield described as “a large sum of crack and powder cocaine.” Major Barefield stated that he also found two “bricks of powder cocaine” which weighed about 2.2 pounds each. According to Major Barefield, several more bags of powder and crack cocaine were found in the residence.
¶ 7. Major Barefield stated that Barlow then led the officers to what Barlow referred to as “his” bedroom, where he showed them yet more drugs. Major Barefield testified that they also found a handgun in Barlow’s bedroom. He stated that Barlow implicated himself in the drug operation, stating that all of the items that had been recovered belonged to him and that selling drugs provided him with a means of income. Major Barefield also stated that the quantity of the drugs and the different ways in which they were packaged led him to conclude that Barlow was involved in the distribution of crack and powder cocaine. McWilliams and Barlow were arrested and taken into custody. Major Barefield estimated that the total street value of the drugs recovered from Barlow’s residence was approximately $345,730.
*201 ¶ 8. B.W. Pitts, a deputy with the Sheriffs Department, also assisted with the investigation and testified for the State. Deputy Pitts testified that after Major Barefield read Barlow and McWilliams their rights, he placed Barlow in his patrol car and took him to the house. According to Deputy Pitts, while Barlow was in the car, they had a “conversation” wherein Barlow informed him that there would be “a lot of more drugs” in the house. On cross-examination, Deputy Pitts was asked if he questioned Barlow on the way to the house, and he responded by stating that: “I just made a statement that if it was anymore there, you know, it’d be best to tell it. And then that’s when he said we was gonna find a lot.” Deputy Pitts did not participate in the search of the residence.
¶ 9. John Whitaker, a deputy with the Sheriffs Department, was also present at the roadblock and assisted in arresting McWilliams and Barlow. Deputy Whitaker recalled a slightly different version of how the drugs were discovered when McWilliams exited the vehicle. He testified that he asked McWilliams to exit the vehicle and that when he attempted to perform a pat-down search, drugs fell out of McWilliams’s shirt. He notified Major Barefield, placed McWilliams in handcuffs, read him his rights, and placed him in the patrol car. Deputy Whitaker searched the vehicle and found another bag of what appeared to be cocaine. He stated that at that point Barlow said, “Pve got more at the house and I’ll show you.”
¶ 10. The last witness the State called was the owner of the Beard Road residence, Charles Brown. McWilliams and Barlow are Brown’s nephews, and Brown allowed them to reside at the residence. He testified that McWilliams and Barlow were living at the residence at the time of this incident. On cross-examination, Brown testified that he did not give Barlow a key to the residence, but he also stated that he did not know if Barlow had a key.
¶ 11. The defense presented three witnesses: Alfred Motley, Barlow’s long-time friend; Theresa Barlow, Barlow’s mother; and Frederick Barlow, Barlow’s uncle. Motley stated that he grew up with Barlow. Motley testified that Barlow did not live at the Beard Road residence because he had been living with his grandmother and mother on Beauregard Road in March 2004. He stated that he would often see Barlow at the Beauregard Road residence. On cross-examination, Motley conceded that he did not spend a significant amount of time with Barlow and that he did not know if Barlow had spent nights away from his grandmother’s house.
¶ 12. Theresa also testified that Barlow lived on Beauregard Road in March 2004. Theresa stated that she had seen some of Barlow’s personal belongings at the Beauregard residence. Theresa testified that she was aware that McWillliams lived at the Beard Road residence, but she stated that she did not know whether Barlow visited him there. Regardless, she was certain that Barlow did not live at the Beard Road residence.
¶ 13. Frederick stated that he had been living at the Beauregard residence for approximately seven months prior to the incident in question and that Barlow lived there as well. Frederick testified that the only other residence at which Barlow lived was his mother’s. On cross-examination, Frederick stated that he was not sure whether Barlow spent the night at the Beauregard residence on March 2, 2004. On redirect examination, Frederick testified that Barlow spent most nights at the Beauregard residence.
¶ 14. Following the conclusion of the evidence, the jury found Barlow guilty of *202 possession of cocaine with intent to distribute while in possession of a firearm and of conspiracy to distribute cocaine.
¶ 15. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Fourth Amendment

¶ 16. Barlow contends that the drugs that were seized during the traffic stop and those that were seized from the Beard Road residence are fruits of an unlawful search and seizure that should not have been admitted into evidence. Barlow argues that the officers did not have reasonable suspicion or probable cause to make the warrantless stop, and that the roadblock was violative of the Fourth Amendment because it was pretex-tual, as it was set up solely to apprehend him. Barlow cites Indianapolis v. Edmond, 531 U.S. 32, 44, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) for the proposition that roadblocks that are set up solely to trap drug offenders have been found to violate the Fourth Amendment. In Edmond, the City of Indianapolis instituted a vehicle checkpoint operation in which roadblocks were set up “in an effort to interdict unlawful drugs.” Id. at 34, 121 S.Ct. 447. The United States Supreme Court held that the vehicle checkpoints violated the Fourth Amendment because their primary purpose was “to advance ‘the general interest in crime control.’ ” Id. at 44 n. 1, 121 S.Ct. 447.
¶ 17. Barlow’s reliance on Edmond is misplaced, as he fails to consider that because he is a parolee, he has a lesser expectation of privacy. While we recognize that the Fourth Amendment mandates that searches be reasonable, “the reasonableness of a search is determined ‘by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.’ ” United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). In Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), the United States Supreme Court held that:
[P]arolees are on the “continuum” of state-imposed punishments. [Knights, 534 U.S. at 119], 122 S.Ct. 587, 151 L.Ed.2d 497 (internal quotation marks omitted). On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this Court has pointed out, “parole is an established variation on imprisonment of convicted criminals.... The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence.” Morrissey [v. Brewer, 408 U.S. 471, 477, 92 S.Ct. 2593, 2598 33 L.Ed.2d 484, 492 (1972) ]. “In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.”
Further, in Robinson v. State, 312 So.2d 15, 18 (Miss.1975), the Mississippi Supreme Court concluded that “courts generally hold that although an inmate is released on parole, the parole authorities may subject him, his home and his effects, to inspection and search as may seem advisable to them.” This issue lacks merit.

2. Mississippi Code Annotated Section 4,7-7-27

¶ 18. Next, Barlow contends that because Officer Purser was a field officer *203 and not a field supervisor he lacked the authority to “detain or arrest [him] without a warrant and [had] ... no lawful authority to delegate that power to regular law enforcement officers.” In support of his argument, Barlow cites to Mississippi Code Annotated section 47-7-27 (Rev. 2004) which provides, in part, that:
Any field supervisor may arrest an offender without a warrant or may deputize any other person with power of arrest to do so by giving him a written statement setting forth that the offender has, in the judgment of that field supervisor, violated the conditions of his parole or earned-release supervision. Such written statement delivered with the offender by the arresting officer to the official in charge of the department facility from which the offender was released or other place of detention designated by the department shall be sufficient warrant for the detention of the offender.
Although the Mississippi Code does not define field officers and field supervisors, we interpret a field supervisor, within the meaning of section 47-7-27, as someone who supervises parolees, rather than someone who supervises other field officers. In other words, a field supervisor is someone who supervises in the field. Furthermore, we conclude that the Mississippi Code uses the terms field officer and field supervisor interchangeably. Therefore, pursuant to section 47-7-27, Officer Purser had the authority to initiate the roadblock with the Sheriffs Department. Moreover, Officer Purser had received tips that a parolee was actively involved in criminal activity, so despite Barlow’s assertions to the contrary, Officer Purser was not required to wait until he had independent reason to believe that Barlow had committed a crime to arrest him.
¶ 19. We also point out that Officer Purser took steps to corroborate the tips prior to the Sheriffs Department setting up the roadblock, by going to the Beard Road residence and by attempting to contact Barlow’s parole officer. Although Officer Purser could not reach Officer Thompson, he spoke with Officer Ferrell, who informed him that Barlow had failed two drug tests while he was in the custody of the Mississippi Department of Corrections.
¶ 20. Barlow argues that even if this Court were to conclude that field officers and field supervisors have authority to institute arrests of parolees over which they have no direct supervision, Officer Purser’s “failure to provide Lincoln County Sheriffs Deputies who assisted him ... [with] a written statement authorizing them to detain ... Barlow,” as well as his failure to provide a similar written statement to the Lincoln County Jail, warranted suppression of the evidence. Barlow further argues that the evidence should have been suppressed because Officer Purser “was not physically present when Barlow was stopped by Lincoln County Sheriffs Deputies.” We acknowledge that Officer Purser was not stationed at the end of the road where Barlow entered; rather, he was at the opposite end of the road. Nevertheless, he was promptly notified by the sheriffs deputies that Barlow had been detained, and nothing of consequence occurred until Officer Purser arrived at the scene. It is clear that the sheriffs deputies were simply assisting Officer Purser. We have already concluded that Officer Purser had authority to arrest Barlow pursuant to section 47-7-27, and we also conclude that his presence at the scene alleviated the need to issue a written statement to the Sheriffs Department. There is no merit to this issue.

*204
S. Motion to Suppress Incriminating Statements

¶ 21. Barlow argues that the trial court erred in refusing to suppress statements that he allegedly made to law enforcement officers after he was apprehended at the roadblock. Officer Purser, Major Barefield, Deputy Pitts, and Deputy Whitaker all testified that Barlow admitted to owning the drugs that were recovered from the vehicle and that he agreed to lead them to the Beard Road residence and showed them where more drugs were located. Officer Purser testified at the suppression hearing that the following occurred after Barlow and McWilliams came through the roadblock:
Q. If you would just tell us briefly what happened on March 2.
* * * * * *
A. At approximately 1800 hours a vehicle came through the roadblock on the other end. They contacted me and said he is there.... Mr. McWil-liams I believe got out on the other side and when he got out the drugs fell out of the car. And, at that time, both individuals was [sic] mir-andarized [sic] and I asked Mr. Barlow where he was living at. He stated he was staying with his uncle on Beard Road and had been there approximately three weeks. I asked him if there were any more drugs in the vehicle and he stated there were. He said the drugs in the vehicle belonged to him. And there were also drugs in the residence. And the drugs there also belonged to him.
THE COURT: Who said that?
A. Mr. Barlow?
THE COURT: The drugs where also belonged to him?
A. The drugs at his residence where he was residing. Mr. Barlow carried us to that residence. I think Mr. McWilliams signed the consent form to search his residence while Mr. Barlow advised me that he would show me where the drugs was at [sic]. So, we went in the house and he carried me to the storage room, and he had a shoe box that had cocaine and a sack, and it had drugs in it, also. This duffel bag also contained drugs.
Major Barefield provided the following testimony at trial:
Q. After you did read them their rights, what happened at that point?
A. Thomas McWilliams stated that this did not belong to him and Corey Barlow stated that it did. I also asked was there anymore [sic] in the vehicle and he said yes.
Q. Let’s clarify that. Corey Barlow said it belonged to who [sic]?
A. Him; to him.
Q. To ...
A. To Corey Barlow.
Q. And what was he referring to?
A. The drugs; the crack cocaine.
* * ;¡: * 4! *
Q. I believe you said that Mr. Barlow told you that there were other drugs that were in the truck?
A. Yes, sir, he did.
Q. What did he say? How did that come out?
A. After being read his rights and ask [sic] him if he understood ’em [sic], I asked if there was [sic] anymore [sic] drugs. Asked another question a few seconds later and asked if there was [sic] anymore [sic] drugs and he said, yes, there was another bag in the vehicle.
*205 Q. Do you have that?
A. Yes, sir, I do.
******
Q. After that exhibit was recovered, what happened at that point?
A. We went to the residence on Beard Road.
Q. Did he make any statements prior ... after you recovered that about the residence?
A. The statement ... I’m trying to remember exactly how it was said, but when asked about the residence down the road, he said, yes, he agreed to take us down there and show us more drugs.
******
Q. What other statements did he make?
A. He went on to tell me that the items here that we had recovered were his; that that was the way he was making income, or money, was from those items. He went on to tell me about how much money he had approximately spent when he originally purchased the cocaine and then what he intended to make; somewhere in the neighborhood of $60-80,000 is what he said we would find there at his house as far as the value of the cocaine because some of it has already been gone [sic]. And then he was planning on making over $300,000 off of this so he could move to Florida. He said he had a girlfriend and was planning on marrying her and moving off.
* * * * * *
Q. At the time that he was telling you these statements, making these statements to you, was he openly talking to you?
A. Oh, yes, sir, he was. He went on in more details [sic]. It’s just over the time span here, I don’t recall everything said.
¶ 22. Deputy Pitts testified that while he was transporting Barlow to the residence, Barlow told him that they were going to find a large amount of drugs at the house. Deputy Whitaker was asked whether he had heard Barlow make any incriminating statements after he had been read his Miranda rights. Deputy Whitaker responded by stating that:
After we had, at that point after he was Mirandized, I went back to the vehicle and started to search the vehicle. I found another bag of cocaine located between the front seats. At that point, I heard the defendant state that [“] I’ve got more at the house and I’ll show you.[”]
¶ 23. Barlow denies making the statements quoted above and argues the trial judge violated his constitutional rights by admitting them into evidence. Specifically, Barlow argues that he could not have “voluntarily, knowingly, and intelligently waived his constitutional right to remain silent when he vehemently denies that his Miranda rights were read to him before he is alleged to have made statements, and when he adamantly denies that the statements attributed to him were ever made.” Further, Barlow argues that there was no need for the State to introduce the statements that he allegedly made since the trial judge had already upheld the war-rantless search that resulted in his arrest. As evidenced from the above quoted passages, the statements were freely given after Barlow had been informed of his rights. Thus, although he may not have explicitly waived his rights, he implicitly did so by continuing to talk after he had been advised that he was under no obli *206 gation to make any statements. This issue is without merit.

i- Motion to Strike Portions of Indictment

¶ 24. Barlow argues that the trial judge erred in refusing to strike portions of the indictment that charged him with possession of cocaine with intent to distribute while in possession of a firearm, which subjected him to enhanced punishment pursuant to Mississippi Code Annotated section 41-29-152 (Rev.2005).[6] Barlow was indicted by a grand jury and the trial judge cannot be found in error for refusing to strike portions of an indictment when there is evidence to support the charged offense. “The court must indulge the presumption that the grand jury is composed of [persons] who have a reasonable degree of intelligence and would perform their duties in accordance with the law and the evidence before them.” Mosley v. State, 396 So.2d 1015, 1019 (Miss.1981) (quoting Price v. State, 152 Miss. 625, 642, 120 So. 751, 755 (1929)). The prosecution is then charged with presenting evidence to the jury so it can determine whether the defendant is guilty of the offense as charged in the indictment. Thus, this argument would be proper only if, after the State had presented its case, it had failed to present proof that Barlow possessed the cocaine while he possessed the handgun, which is clearly not the case. Major Bare-field testified that he found a handgun in one of the rooms where drugs were found. After hearing the evidence before it, the jury convicted Barlow, and he was sentenced by the trial judge in accordance with section 41-29-152. There is no merit to this issue.

5. Prior Convictions, Parolee Status, and Improper Closing Argument Remarks

¶ 25. Prior to trial, Barlow moved the court to exclude evidence of his prior convictions of possession of marijuana with the intent to distribute and conspiracy to possess marijuana with intent to distribute. During the presentation of the State’s case, the court ruled that the evidence was admissible under Rule 404(b) of the Mississippi Rules of Evidence. Thereafter, Major Barefield was asked during direct examination if, during the course of his investigation, he had discovered why Barlow was on parole. Major Barefield responded that he had and produced a copy of the sentencing order for Barlow’s prior convictions. The sentencing order, which was admitted into evidence, shows convictions of two counts: one for possession with intent to deliver more than one ounce of marijuana but less than one kilogram, and the other for conspiracy to distribute marijuana. Barlow argues that the trial judge erred in admitting the evidence of his prior convictions. Specifically, Barlow contends that this information inflamed the jury and unfairly prejudiced his defense. Barlow also argues that the trial *207 court erred in allowing evidence regarding his status as a parolee. The State contends that the evidence regarding Barlow’s prior convictions was admissible to show that Barlow intended to distribute the contraband.
¶ 26. Our review of the record reveals four instances where Barlow’s parolee status was mentioned, one of which was during the State’s closing argument. As stated, the trial court admitted into evidence a copy of the sentencing order for Barlow’s prior convictions. It is reasonable to assume that the jury likely was able to learn from the sentencing order that Barlow had prior convictions for drug offenses. Therefore, if the sentencing order was properly admitted, and it was, it was not improper for the prosecutor to make reference to those convictions during his closing argument.
¶ 27. Barlow also argues that the prosecutor committed reversible error by arguing facts that were not in evidence. Specifically, Barlow takes issue with the following statements made by the prosecutor in his closing argument: “Why was his girlfriend’s gun in that house, in his bedroom that he said belonged to him. Why is it still in there? That was not disputed. This is his girlfriend’s gun. Why is it in that house?” Barlow further argues that the prosecutor erred by stating that: “He’s walking around with his girlfriend’s pistol and bullets and he’s got $1800.00 that he’s claiming and you can see the $90.00 that [—][.]” Barlow objected to the statements; however, he did not do so until after the jury had retired to the jury room. At that point, Barlow requested that the jury be admonished and that the court give a limiting instruction informing the jury that they should not consider the statements that the prosecutor made relating to Barlow’s girlfriend because they were not in evidence. This issue is procedurally barred due to Barlow’s failure to timely object. “It is axiomatic that a litigant is required to make a timely objection.” Smith v. State, 797 So.2d 854, 856(¶ 7) (Miss.2001) (citing Barnett v. State, 725 So.2d 797, 801(¶23) (Miss.1998)). It is well established that “if no contemporaneous objection is made, the error, if any, is waived.” Id. (citing Walker v. State, 671 So.2d 581, 597 (Miss.1995)). Procedural bar notwithstanding, we find no merit to this issue.
¶ 28. In Slaughter v. State, 815 So.2d 1122, 1133(¶ 57) (Miss.2002) (citing Brooks v. State, 763 So.2d 859, 863(¶ 9) (Miss.2000)), the Mississippi Supreme Court held that “[i]n the closing argument a prosecutor is allowed to argue evidence that has been admitted.” The Slaughter court further held that “arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error.” Id. (quoting Brooks, 763 So.2d at 863(¶ 9)). We conclude, as did the court in Slaughter, that we do “not condone the prosecution stating matters not in evidence and potentially causing the jury to disfavor the defendant.” Id. Nevertheless, we find that the error did not rise to the level of reversible error, as the natural and probable effect of the prosecutor’s argument did not “create an unjust prejudice against [Barlow] as to result in a decision influenced by the prejudice so created.” Id. at (¶ 58) (quoting Brooks, 763 So.2d at 864(¶ 12)).

6. Major Barefield’s Testimony

¶ 29. In this assignment of error, Barlow argues that the trial court erred in allowing Major Barefield to provide expert testimony, as it “unfairly bolstered the factual portion of his testimony.” We note that it is not entirely clear whether the trial judge qualified Major Barefield as an expert because at one point the judge *208 ruled that Major Barefield could simply provide testimony as a fact witness. However, it appears that later the trial judge in fact qualified Major Barefield as an expert:
Again, my ruling is that Major Barefield may testify as to the manner in which he has ordinarily encountered cocaine in its various stages in his career as a law enforcement officer. I think, frankly, the testimony need not necessarily be, although it is inherently opinion testimony, need not necessarily be framed into, [“] you have an opinion as to how cocaine is ordinarily sold?[”] It’s an opinion, but it’s very ... I guess it’s not an ultimate opinion, ultimate question, but will not permit testimony as to, [“JThis is how ... [”] ... [“] This means all of these elements together mean that this person was going to sell drugs.[”] That’s the opinion I’m not going to allow. Is that clear? Clear enough?
sfc Hi ¡t'
The question of whether that ultimate opinion is helpful to the trier of fact is a fact-driven question, dependent on the testimony that’s been elicited. So all that [is] to say that that could change. In other words, if, during the course of the testimony it became ... for some reason it developed that additional testimony—I have qualified him as an expert. I’m limiting his testimony based on what I feel is helpful to the jury and what I [think] invades the province of the jury, potentially, trying to keep that out. What might or might not be helpful to the jury is fact-driven depending on the testimony that’s elicited. So I will say that that’s not to say that at some point, although I don’t intend to revisit this ruling, that I could say, well, okay, the way the testimony has all developed, it would be helpful to get into more detail. I think it is ... I think it would be unhelpful to deprive the jurors of the knowledge that Major Barefield has gained through 2,000 drug investigations and through seizures of a lot of drugs. I think that’s beyond the experience of most jurors, hopefully. And I think that’s the proper subject of his testimony, in that limited area.
Despite the confusion, we conclude that Major Barefield’s testimony was based on his experience as a law enforcement officer and did not exceed what is allowed under Rule 701 of the Mississippi Rules of Evidence.[7] There is no merit to this issue.

7. Jury Instructions

¶ 30. Barlow asserts that the trial judge erred in refusing to grant defense instructions D-7 and D-31and in granting State’s instructions S-3, S-4, and S-12A. In Ellis v. State, 790 So.2d 813, 815-16(¶ 6) (Miss.2001) (quoting Hill v. Dunaway, 487 So.2d 807, 809 (Miss.1986)), the Mississippi Supreme Court held that:
The refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper, only if the trial court-and this Court on appeal-can say, taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find *209 the facts in accordance with the theory of the requested instruction.
D-7 provides as follows:
The Court instructs the Jury that it cannot be presumed that, simply because two people associate with one another, they are accomplices in a common crime. Rather, in order for you to convict Corey Barlow of conspiracy to commit the crime of unlawful possession of cocaine with the intent to distribute, you must be satisfied that the [S]tate has proven, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that there was a recognition on the part of Corey Barlow and his alleged conspirator that they were entering into a common plan to possess and distribute cocaine, and that they knowingly intended to further this common purpose. Further, there must also be sufficient evidence presented by the [S]tate to establish, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, what it was that Corey Barlow and his alleged conspirator conspired to do. If you find from the evidence presented that the [S]tate failed to meet these burdens, you must acquit Corey Barlow of conspiracy to commit the crime of possession of cocaine with intent to distribute.
D-31 reads:
This Court instructs the Jury that if you believe from the evidence that there may have been some other person who committed the crime with which Corey Barlow is charged, and that the name of that person has not been disclosed by the evidence, it is not required of Corey Barlow to prove the identity of such person. In other words, if you believe from the evidence that someone other than Corey Barlow possessed the narcotics with or without the intent to distribute them, you must acquit Corey Barlow, without requiring Corey Barlow to solve the case. Likewise, if you believe that someone else committed the crime for which Corey Barlow is charged and the identity of that person has been disclosed by evidence, you must acquit Corey Barlow.
¶ 31. The State objected to instruction D-7 because it argued that the instruction contained a reasonable hypothesis and circumstantial language. The trial judge denied the instruction based on his prior decision to exclude a circumstantial evidence instruction. The State then argued that D-31 was circumstantial and repetitive. The trial judge ruled that the instruction was an incorrect statement of the law, finding that more than one person could have been in possession of the drugs. The trial judge also correctly concluded that the instruction was cumulative. We find no error in the trial judge’s decision, as it is well established that judges cannot be found in error for refusing to grant jury instructions that are similar to others that have already been given. Montana v. State, 822 So.2d 954, 961(¶ 26) (Miss.2002) (citing Ellis, 790 So.2d at 815(¶ 5)). Moreover, a trial judge may properly “refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Harris v. State, 861 So.2d 1003, 1012-13(¶ 18) (Miss.2003) (citing Humphrey v. State, 759 So.2d 368, 380(¶ 33) (Miss.2000)).
¶ 32. As for Barlow’s argument regarding instructions S-3, S-4, and S-12A, he contends that they are abstract statements of the law and should have been excluded by the judge.[8] We acknowledge that Bar *210 low is technically correct in the sense that the State failed to tailor the instructions to the facts in this case. However, we note that the most important determination to be made is whether the instructions adequately instructed the jury. We conclude that they did. Therefore, this issue lacks merit.

8. Sufficiency of the Evidence

¶ 33. Barlow contends that the trial judge erred in denying his motion for a directed verdict and his motion for a judgment notwithstanding the verdict. In Parker v. State, 962 So.2d 25, 26(¶8) (Miss.2007) (quoting Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005)), the Mississippi Supreme Court held that “[w]hen reviewing a case for sufficiency of the evidence, ‘the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” We review the trial court’s decision under an abuse of discretion standard, and the evidence will be deemed sufficient “[a]s long as ‘reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense’.... ” Smith v. State, 925 So.2d 825, 830(¶ 10) (Miss.2006) (quoting Brown v. State, 907 So.2d 336, 339(¶ 8) (Miss.2005)).
¶ 34. First, Barlow argues that the evidence was insufficient to sustain his conviction of conspiracy to possess cocaine with intent to distribute. He argues that there is no proof that he and McWilliams entered into an agreement to possess and distribute cocaine. In Mississippi, the law on conspiracy is as follows:
For there to be a conspiracy, “there must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.” The conspiracy agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. Furthermore, the existence of a conspiracy, and a defendant’s membership in it, may be proved entirely by circumstantial evidence.
Franklin v. State, 676 So.2d 287, 288 (Miss.1996) (quoting Nixon v. State, 533 So.2d 1078, 1092 (Miss.1987)) (emphasis added). Barlow argues that the only evidence of a conspiracy came from Major Barefield’s testimony and that that testimony is insufficient to support his conviction of conspiracy to possess cocaine with intent to distribute. We disagree. As stated, when Barlow was stopped, McWil-liams was riding with him. As McWilliams exited the car, a quantity of drugs fell from his lap. The search of McWilliams revealed approximately two thousand dollars in cash. Additionally, although disputed by Barlow, there was testimony that *211 Barlow and McWilliams lived in the Beard Road residence where a large quantity of cocaine was found. Based on this evidence, we find that a jury reasonably could have found that Barlow and McWilliams were conspiring to possess and distribute cocaine. Thus, we find no merit to this issue.
¶35. Second, Barlow argues that there was insufficient evidence to establish that he intended to distribute the cocaine. Clearly, this issue lacks merit, as Major Barefield testified that Barlow informed him that he intended to sell the cocaine. Moreover, Major Barefield testified that he found no syringes, crack pipes, or paraphernalia to suggest that Barlow intended to personally consume the cocaine. It can be logically inferred that when a person possesses the amount of drugs that Barlow did, it is more likely than not that they will not be used for personal consumption. “Our law on this subject states intent may be established by circumstantial evidence.” Jackson v. State, 580 So.2d 1217, 1219 (Miss.1991) (citing Hollingsworth v. State, 392 So.2d 515, 517 (Miss.1981)). “The quantity of the drug in itself can be sufficient to infer intent to distribute beyond a reasonable doubt.” Id. There is no merit to this issue.
¶ 36. Third, Barlow argues that there was insufficient evidence to support the enhancement for possessing the cocaine while in possession of a firearm. Although the firearm was found in Barlow’s bedroom, the same bedroom where cocaine was discovered, the State was required to prove that he constructively possessed it because it was not found on Barlow’s person. “Constructive possession allows the prosecution to establish possession of contraband when evidence of actual possession is absent. Constructive possession is established by showing that the contraband was under the dominion and control of the defendant.” Williams v. State, 971 So.2d 581, 587(¶16) (Miss.2007) (quoting Roberson v. State, 595 So.2d 1310, 1319 (Miss.1992)). Furthermore, because both Barlow and McWilliams lived at the Beard Road residence, the State was required to prove that the firearm in fact belonged to Barlow. In Williams, the Mississippi Supreme Court stated:
We have held that where contraband is found upon premises not in the exclusive control and possession of the accused, additional incriminating facts must connect the accused with the contraband. Where the premises upon which contraband is found is not in the exclusive possession of the accused, the accused is entitled to acquittal, absent some competent evidence connecting him with the contraband.
Williams, 971 So.2d at 587-88(¶ 17). We conclude that “competent evidence connecting [Barlow] to the contraband” existed. We point out that even though Barlow did not have exclusive dominion and control over the residence, cocaine and the firearm were found in the bedroom that the officers testified that Barlow told them belonged to him. Thus, despite Barlow’s contentions to the contrary, there is sufficient evidence to support his conviction for possession of cocaine while in possession of a firearm. There is no merit to this issue.

9. Proportionality of Sentence

¶37. Barlow relies on Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) to support his argument that his sentence of sixty years with forty-seven years to serve in the custody of the Mississippi Department of Corrections violates the United States and Mississippi constitutions. In Solem,, the United States Supreme Court set the standard for proportionality as follows:
*212 [A] court’s proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (I) the gravity of the offense and harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.
Solem, 463 U.S. at 292, 103 S.Ct. 3001.
¶ 38. Barlow argues that his sentence is disproportionate based on the three-pronged analysis in Solem. However, in Harmelin v. Michigan, 501 U.S. 957, 965, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the United States Supreme Court overruled Solem to the extent that it found a proportionality guarantee in the Eighth Amendment. The Harmelin court held that “So-lem was simply wrong; the Eighth Amendment contains no proportionality guarantee.” Id. Further, the Mississippi Supreme Court has held that “[i]n light of Harmelin, it appears that Solem is to apply only when a threshold comparison of the crime committed to the sentence imposed leads to an inference of ‘gross dis-proportionality.’ ” Hoops v. State, 681 So.2d 521, 538 (Miss.1996) (quoting Smallwood v. Johnson, 73 F.3d 1343, 1347 (5th Cir.1996)).
¶ 39. Barlow was convicted of violating Mississippi Code Annotated section 41-29-139(c)(1)(E) (Rev.2005), which provides:
Any person who violates this subsection with respect to (l)[a] controlled substance classified in Schedule I or II, except marihuana, in the following amounts shall be charged and sentenced as follows: Thirty (30) grams or more or forty (40) dosage units or more, by imprisonment for not less than ten (10) years nor more than thirty (30) years and a fine of not more than One Million Dollars ($1,000,000.00).
Barlow’s sentence was enhanced because he possessed a firearm while he possessed a Schedule II controlled substance. Pursuant to section 41-29-152(1), Barlow “may be punished by a fine up to twice that authorized by Section 41-29-139 or 41-29-313, or by a term of imprisonment or confinement up to twice that authorized by Section 41-29-139 or 41-29-313, or both.” The Mississippi Supreme Court has held that “[sjentencing is within the complete discretion of the trial court and [is] not subject to appellate review if it is within the limits prescribed by statute.” Hoops, 681 So.2d at 537 (citation omitted). We find that Barlow’s sentence was within the statutory limits; thus, no further analysis pursuant to Solem is required.
¶ 40. We also point out that the trial judge could have enhanced Barlow’s sentence based on Barlow’s status as a second or subsequent offender pursuant to Mississippi Code Annotated section 41-29-147 (Rev.2005), which reads: “Except as otherwise provided in Section 41-29-142, any person convicted of a second or subsequent offense under this article may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that authorized, or both.” Further, the Mississippi Supreme Court concluded in Jones v. State, 523 So.2d 957, 961 (Miss.1988) that “under current statutes, double enhancement is proper, provided it meets the test adopted in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).” This issue lacks merit.

10. Cumulative En-or

¶ 41. In his final assignment of error, Barlow argues that the cumulative effect of the errors denied him his fundamental right to a fair trial. There is no requirement that criminal defendants receive a perfect trial. Wilson v. State, 936 So.2d 357, 365(¶ 24) (Miss.2006) (citing Sand v. State, 467 So.2d 907, 911 (Miss. *213 1985)). We recognize that “individual errors, not reversible in themselves, may combine with other errors to make up reversible error.” Lynch v. State, 951 So.2d 549, 555(¶ 19) (Miss.2007) (quoting Manning v. State, 726 So.2d 1152, 1198 (¶202) (Miss.1998)). However, we note that “[w]here there is ‘no reversible error in any part, ... there is no reversible error to the whole.’ ” Id. This issue lacks merit.
¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF LINCOLN COUNTY OF CONVICTION OF COUNT I: POSSESSION OF AT LEAST THREE BUT LESS THAN FOUR KILOGRAMS OF COCAINE WITH THE INTENT TO DISTRIBUTE AND SENTENCE OF FIFTY YEARS, ENHANCED BY POSSESSION OF A FIREARM, AND COUNT II: CONSPIRACY TO POSSESS COCAINE WITH INTENT TO DISTRIBUTE AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THIRTEEN YEARS SUSPENDED AND THIRTEEN YEARS OF POST-RELEASE SUPERVISION AND PAYMENT OF A $10,000 FINE, $105 IN RESTITUTION, AND $300 TO THE STATE CRIME LAB, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LINCOLN COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. ROBERTS, J., CONCURS IN RESULT ONLY.

. It is undisputed that the "roadblock” was set up solely to stop Barlow and that no other vehicles were stopped.

. Barlow filed a motion to suppress the drugs that were found in his vehicle, as well as the drugs that were later found at his residence. On August 16, 2004, a suppression hearing was held during which the trial judge denied Barlow’s request and allowed all of the drugs into evidence at trial. Officer Purser testified at a suppression hearing, but he did not testify at trial.

. Major Barefield testified at the suppression hearing and at the trial; we note that his testimony at trial was inconsistent with his testimony at the suppression hearing. At the suppression hearing, he stated that he did not enter the Beard Road residence; however, at trial, he provided an in-depth account of what transpired inside the residence. Although we acknowledge this inconsistency, we proceed with our analysis, as there was no objection from the defense.

. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court set forth guidelines that law enforcement officials must follow before engaging in custodial interrogation of criminal suspects.

. At the suppression hearing, Officer Purser testified that Barlow had a key to the residence and unlocked the door. However, Major Barefield testified that he did not know whether Barlow had a key to the residence. Nevertheless, Officer Purser's account of what occurred on March 2, 2004, was essentially the same as Major Barefield's.

. We note that the indictment incorrectly lists Mississippi Code Annotated section 41-29-151 (Rev.2005) as the section which addresses sentence enhancement for possessing controlled substances while in possession of a firearm; however, section 41-29-152(1) actually addresses this matter:
Any person who violates Section 41-29-313 or who violates Section 41-29-139 with reference to a controlled substance listed in Schedule I, II, II, IV or V as set out in Sections 41-29-113 through 41-29-121, Mississippi Code of 1972, inclusive, and has in his possession any firearm, either at the time of the commission of the offense or at the time any arrest is made, may be punished by a fine up to twice that authorized by Section 41-29-139 or 41-29-313, or by a term of imprisonment or confinement up to twice that authorized by Section 41-29-139 or 41-29-313, or both.

. Rule 701 of the Mississippi Rules of Evidence provides:
If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

. S-3 reads:
This Court instructs the Jury that to consti *210 tute a possession there must be sufficient facts to warrant a finding that the defendant was aware of the presence of the particular substance and was intentionally and consciously in possession of it. It need not be actual physical possession; constructive possession may be shown by establishing that the substance involved was subject to the defendant’s dominion or control. Proximity, by itself, is not adequate in the absence of other incriminating circumstances. S-4 simply defines the words: intent, distribute, deliver, administering, and dispensing.
S-12A provides that:
The Court instructs the Jury that any person who aids, assists, or encourages the commission of a felony is a principal to the crime, and the guilt or innocence of such person in no wise depends upon whether the other participant has been charged, tried, or convicted or acquitted of the commission of the crime.